## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ASSURE NEUROMONITORING LOUISIANA, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 21-cv-01489** |
| **FAIRWAY MEDICAL CENTER, L.L.C., d/b/a AVALA** | **SECTION "H"** |

## ORDER AND REASONS

Before the Court are Defendant Fairway Medical Center, LLC d/b/a/ Avala's Motion for Partial Summary Judgment for Failure to Mitigate Damages (Doc. 40); Motion to Exclude the Opinion and Testimony of Plaintiff's Expert (Doc. 42); Motion for Judgment on the Pleadings (Doc. 41); and Motion for Leave to File Supplemental Witness List (Doc. 81). For the following reasons, Defendant's Motion for Judgment on the Pleadings is **GRANTED**, and all other Motions are **DENIED**.

## BACKGROUND

Plaintiff Assure Neuromonitoring Louisiana, LLC brings this action against Defendant Fairway Medical Center, LLC d/b/a Avala to recover damages arising from Defendant's allegedly wrongful receipt of compensation for intraoperative neuromonitoring ("IONM") services that Plaintiff provided. Plaintiff alleges that it entered into a contractual agreement with Defendant to provide IONM services in exchange for the "exclusive right to bill and collect any fees from patients and third-party payors associated with" Plaintiff's

services ("the Assure–Avala Agreement").[1] Plaintiff further alleges that at the time that the parties entered into the Assure–Avala Agreement, Defendant had a separate agreement with Blue Cross Blue Shield of Louisiana ("BCBSLA"), a private insurance payor, under which Defendant was paid directly by BCBSLA a bundled payment for each surgery, a portion of which was for the  technical component of the IONM services performed for each surgery (the "BCBSLA–Defendant Agreement"). Plaintiff alleges that because of the BCBSLA–Defendant Agreement it could not bill or collect payment from BCBSLA for the technical component of the IONM services it provided. Plaintiff also alleges that Defendant has not paid it for the IONM services covered by BCBSLA for which it collected payment. Plaintiff further alleges that Defendant knew of its arrangement with BCBSLA at the time that it entered into the contract with Plaintiff, but it did not inform Plaintiff of this arrangement or the fact that Plaintiff would not have the exclusive right to bill and collect fees from patients with BCBSLA insurance for its services. Plaintiff brings several claims against Defendant, including breach of contract, negligent misrepresentation, mutual mistake, unilateral mistake, detrimental reliance, and unjust enrichment.

Now before the Court are four Motions filed by Defendant: (1) Motion for Partial Summary Judgment for Failure to Mitigate Damages; (2) Motion for Judgment on the Pleadings as to Plaintiff's unjust enrichment claim; (3) Motion to Exclude the Opinion and Testimony of Plaintiff's Expert Mark Anderson; and (4) Motion to File Supplemental Witness List. The Court will consider each Motion in turn.

---

[1] Doc. 1.

## LEGAL STANDARD

### A. Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2]  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[3]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[4]  "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[5]  Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[6]  "In response to a properly supported motion for summary judgment, the non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-movant would bear the burden of proof at trial."[7] "We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the

---

[2] Sherman v. Hallbauer, 455 F.2d 1236, 1241 (5th Cir. 1972).

[3] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[4] Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 532 (5th Cir. 1997).

[5] Engstrom v. First Nat'l Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995).

[6] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

[7] John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).

necessary facts."[8]  Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[9]

## B. Motion for Judgment on the Pleadings

Rule 12(c) provides that a party may move for judgment on the pleadings, after pleadings are closed but early enough not to delay trial.[10]  The standard for determining a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss.[11]  To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts "to state a claim to relief that is plausible on its face."[12]  A claim is "plausible on its face" when the pleaded facts allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[13]  A court must accept the complaint's factual allegations as true and must "draw all reasonable inferences in the plaintiff's favor."[14]  The court need not, however, accept as true legal conclusions couched as factual allegations.[15]  To be legally sufficient, a complaint must establish more than a "sheer possibility" that the plaintiff's claims are true.[16]  The complaint must contain enough factual allegations to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim.[17]  If it is apparent from the face of the complaint that an insurmountable bar to relief exists and the plaintiff is not entitled to relief, the court must dismiss the claim.[18]  The court's

---

[8] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).

[9] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).

[10] FED. R. CIV. P. 12(c)

[11] Guidry v. Am. Pub. Life Ins. Co., 512 F.3d 177, 180 (5th Cir. 2007).

[12] Ashcroft v. Iqbal, 556 U.S. 662 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007)).

[13] Id.

[14] Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 232 (5th Cir. 2009).

[15] Iqbal, 556 U.S. at 678.

[16] Id.

[17] Lormand, 565 F.3d at 255–57.

[18] Jones v. Bock, 549 U.S. 199, 215 (2007).

4

review is limited to the complaint and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.[19]

## LAW AND ANALYSIS

### A. Motion for Partial Summary Judgment for Failure to Mitigate Damages

Plaintiff provided IONM services pursuant to the Assure–Avala Agreement from January 2019 until June 25, 2021. Defendant contends that Plaintiff was "informed in each of February 2019, March 2019, and April 2019" by multiple sources that it would not be able to collect from BCBSLA for the technical component of the IONM services it provided. Defendant argues that Plaintiff failed to act on this information until late 2020 and continued to provide IONM services at Defendant's facility until June 2021. Defendant argues that by April 2019 Plaintiff knew or should have known that BCBSLA was not going to pay it for its IONM services, and any award of damages should be reduced as of this date for Plaintiff's failure to mitigate damages pursuant to Louisiana Civil Code article 2002.

Article 2002 provides that "[a]n obligee must make reasonable efforts to mitigate the damage caused by the obligor's failure to perform. When an obligee fails to make these efforts, the obligor may demand that the damages be accordingly reduced."[20] "The failure to mitigate damages is an affirmative defense, and the burden of proof is on the party asserting the defense."[21] Article 2002 "adjusts the conflict of interests that would otherwise exist when an obligee neglects to mitigate his damages and thereby exposes the obligor to further liability for consequences resulting from the obligor's failure to perform

---

[19] Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir. 2000).
[20] LA. CIV. CODE art. 2002.
[21] MB Indus., LLC v. CNA Ins. Co., 74 So. 3d 1173, 1181 (La. 2011).

that were reasonably avoidable by the obligee."[22] "The scope of a party's duty to mitigate depends on the particular facts of the individual case, and a party is not required to take actions which would likely prove unduly costly or futile."[23] A duty to mitigate encompasses only "what a 'reasonably prudent man' would have done to lessen his damages, given the facts known to him at the time and avoiding the temptation to view the case through hindsight."[24]

Defendant presents the following evidence in support of its position that Plaintiff failed to mitigate its damages. Plaintiff initially utilized a third-party vendor, Medical Practice Solutions ("MPS"), to bill BCBSLA. In February 2019, MPS informed Plaintiff that it was struggling to collect from BCBSLA because BCBSLA had taken the position that it does not pay the technical component of IONM services to IONM providers. Then, in March 2019, Paul Webster, Plaintiff's 30(b)(6) representative, discussed the issue with a competing IONM service provider who confirmed Mr. Webster's understanding that BCBSLA only pays the technical component of IONM services to the facility. In April 2019, a representative of Plaintiff communicated directly with BCBSLA regarding the issue. The representative of BCBSLA stated: "BCBSLA will pay for the physician who does the reading only. You will need to reach out to the hospital to set up an arrangement for payment of the tech."[25] Plaintiff's representative forwarded this information on April 9, 2019 to Mr. Webster and let him know that they would "need to recoup payment from the facility."[26] Despite this, Defendant avers that Plaintiff did not contact it regarding this issue until August 2020. Based on these facts, Defendant argues that Plaintiff knew on April 9, 2019 at the latest that BCSBLA would not pay for the

---

[22] Lombardo v. Deshotel, 647 So.2d 1086, 1092 (La. 1994).
[23] *MB Indus., LLC*, 74 So. 3d at 1181.
[24] *Id.*
[25] Doc. 40-2 at 50.
[26] Doc. 40-2 at 61.

technical component of its IONM services and that it would need to seek reimbursement from Defendant for those services. Yet, Defendant contends, Plaintiff took no further action until late 2020 and continued to perform more than 500 surgeries at Defendant's facility during that time. Defendant argues that because Plaintiff failed to mitigate its damage, Plaintiff's damages must be reduced to the amounts owed by Defendant for the services provided between January 2019 and April 9, 2019.

In response, Plaintiff contends that although it knew that BCBSLA was resisting payment for its services, it did not know the reason why. It contends that it often had trouble getting payment from various private payors for its services and that it reasonably believed that it would overcome the obstacles preventing BCBSLA from reimbursing it. In February 2019, MPS assured Plaintiff that BCBSLA's position that it did not pay the technical component was "wrong" and that "they will pay."[27] In May 2019, MPS told Plaintiff that it had other clients that were receiving payment for the technical component from BCBSLA. Plaintiff argues that BCBSLA's publicly available policies did not address the issue of reimbursement for the technical component of IONM services until January 2020. It alleges that throughout 2019 and 2020 it was engaged in efforts to negotiate with BCBSLA for payment, including a potential in-network agreement.

Plaintiff alleges that at some point during its negotiations with BCBSLA it became aware for the first time that BCBSLA had taken the position that the technical component of Plaintiff's services was subsumed in its bundled payments to Defendant. Plaintiff contends that it raised the issue with Defendant in June 2020, and Defendant represented that this was inaccurate. Plaintiff contends that it was not until November 2020 when Defendant shared

---

[27] Doc. 40-2 at 42.

7

the relevant language from the confidential BCBSLA–Avala Agreement with Plaintiff that it understood why BCBSLA would not pay it for the technical component of the IONM services it provided: because BCBSLA and Defendant had expressly agreed that BCBSLA's payments would include the technical component of IONM services. Even so, Plaintiff contends that Defendant continued to dispute this and encourage Plaintiff to seek payment from BCBSLA. In February 2021, a representative of Defendant ultimately admitted that the BCBSLA–Avala Agreement was "very clear" as to payment for technical services and suggested that the parties should discuss Defendant providing additional compensation to Plaintiff. Negotiations between the parties continued, and Plaintiff continued to provide services, until Defendant ultimately terminated their agreement in June 2021.

This Court finds that Plaintiff has presented sufficient evidence to create a material issue of fact as to whether it acted reasonably in mitigating its damages. Plaintiff has shown that although it was aware in April 2019 that BCBSLA would not pay it for the technical component of its services, it believed it could work out the issue of payment with BCBSLA, and it relied on MPS's representations thereto. Further, it provides evidence that it was not aware that BCBSLA's refusal to pay the technical component of its services was a result of BCBSLA's agreement with Defendant until November 2020. Stated differently, Plaintiff was not aware that Defendant was in breach of the Assure–Avala Agreement—which gave Plaintiff the exclusive right to bill insurance payors for its IONM services—until that time. Accordingly, a jury could find that Plaintiff acted reasonably in its efforts to mitigate its damages. Summary judgment on this issue is denied.

## B. Motion for Judgment on the Pleadings

Next, Defendant moves for judgment on the pleadings as to Plaintiff's unjust enrichment claim. On September 22, 2021, Defendant filed a Motion to Dismiss Plaintiff's unjust enrichment claim, arguing that because a valid contract governs the parties' relationship, Louisiana law does not permit a claim of unjust enrichment.[28] The Court acknowledged that Louisiana law provides that a claim for unjust enrichment "will only be allowed when there is no other remedy at law."[29] However, the Court denied Defendant's claim, explaining that because Plaintiff had also brought claims for mutual or unilateral mistake, it had not yet been established that a valid, enforceable contract existed. It held that the unjust enrichment claim could persist where it was not yet clear whether Plaintiff had another remedy at law. The Court invited Defendant to re-urge the Motion "[i]f this Court ultimately finds that a valid and enforceable contract exists between the two parties."[30]

Although no such finding has been made, Defendant now re-urges its request for dismissal of Plaintiff's unjust enrichment claim in its Motion for Judgment on the Pleadings. Now, Defendant argues for the first time that Plaintiff's tort claims for negligent misrepresentation and detrimental reliance preclude it from pursuing its unjust enrichment claim. Indeed, the Louisiana Supreme Court has held that a plaintiff is precluded from bringing a claim for unjust enrichment when it has pleaded a negligence claim.[31] Accordingly, Plaintiff's claim for unjust enrichment is dismissed.

---

[28] Doc. 4.
[29] Doc. 17 (quoting Minyard v. Curtis Prods., Inc., 251 La. 624, 650 (La. 1967)).
[30] Id.
[31] Walters v. MedSouth Rec. Mgmt., LLC, 38 So. 3d 243, 244 (La. 2010).

### C. Motion in Limine to Exclude Mark Anderson

Next, Defendant moves to exclude the testimony of Plaintiff's expert witness. In support of its claims, Plaintiff offers the expert testimony of Mark Anderson, an expert in healthcare operations. Anderson offers three opinions:

1. Defendant received payment from BCBSLA for IONM services as part of the bundled reimbursement;

2. Plaintiff reasonably relied on Defendant to disclose that its agreement with BCBSLA included payment for IONM services; and

3. Plaintiff's damages for the 531 services it provided at Defendant's hospital are between $2.3 and $2.9 million based on three different reimbursement models.

Defendant moves to exclude Anderson's testimony, arguing that he offers legal conclusions and that his methodology is unreliable and irrelevant.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The current version of Rule 702 reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharms., Inc.*,[32] and *Kumho Tire Co. v. Carmichael*.[33] The threshold inquiry is whether the expert possesses the requisite

---

[32] 509 U.S. 579 (1993).
[33] 526 U.S. 137 (1999).

qualifications to render opinion on a particular subject matter.[34]   Having defined the permissible scope of the expert's testimony, a court next inquires whether the opinions are reliable and relevant.[35]   In undertaking this tripartite analysis, courts must give proper deference to the traditional adversary system and the role of the jury within that system.[36]   "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[37]  As the "gatekeeper" of expert testimony, the trial court enjoys broad discretion in determining admissibility.[38]

Defendant does not dispute that Anderson is qualified to offer opinions on healthcare operations. Rather, Defendant argues that Anderson's first two opinions are legal conclusions inappropriate for expert testimony. Indeed, the Fifth Circuit has repeatedly held that Rule 704 does not authorize experts to offer legal conclusions.[39]  However, Federal Rule of Evidence Rule 704(a) provides that an "opinion is not objectional just because it embraces an ultimate issue." Here, the Court does not agree that Anderson's opinions offer legal conclusions. Rather, Anderson offers opinions based on his experience and knowledge of the healthcare industry and the customary ways in which service providers and private payors contract and structure payments. Based on this information, he opines on the way in which the Avala–BCBSLA Agreement should be read in light of industry norms. He also explains the confidential nature of agreements between hospitals and private payors, and

---

[34] Wagoner v. Exxon Mobil Corp., 813 F. Supp. 2d 771, 799 (E.D. La. 2011); *see also* Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.").

[35] *See* United States v. Valencia, 600 F.3d 389, 424 (5th Cir. 2010).

[36] *See Daubert*, 509 U.S. at 596.

[37] *Id.*

[38] Wellogix, Inc. v. Accenture, L.L.P., 716 F.3d 867, 881 (5th Cir. 2013).

[39] Goodman v. Harris Cnty., 571 F .3d 388,399 (5th Cir. 2009); United States v. $9,041,598.68, 163 F.3d 238,255 (5th Cir. 1998); Snap–Drape, Inc. v. C.I.R., 98 F.3d 194,198 (5th Cir. 1996).

the effect of that confidentiality on negotiations between providers and hospitals. Although these opinions may embrace ultimate issues in this case—namely, the interpretation of the Avala–BCBSLA Agreement and the reasonableness of Plaintiff's reliance on Defendant—Anderson does not offer legal conclusions. He does not opine that Defendant breached the Assure–Avala Agreement or "merely tell the jury what result to reach."[40] Instead, Anderson offers helpful context regarding the custom and standard practices in the industry for the jury's consideration of the issues.

Next, Defendant complains that Anderson's methodology is unreliable and irrelevant because he used out-of-network data to estimate in-network payments.[41] Specifically, Defendant contends that in its Complaint and throughout much of the discovery in this case, Plaintiff has maintained that its theory of recovery is that Defendant must reimburse it for the portion of the bundled payments made by BCBSLA to Defendant pursuant to the BCBSLA–Defendant Agreement that were for IONM services. Despite this, Defendant argues, Anderson calculated Plaintiff's damages based on the market value of its services as determined by out-of-network reimbursement rates. Defendant argues that utilizing out-of-network reimbursement data is not appropriate because it is not tied to the amounts that BCBSLA paid Defendant for IONM services in its bundled payments. Defendant argues that Anderson's "methodology completely ignores Plaintiff's Complaint, making it wholly unreliable and misleading to the jury."[42]

---

[40] FED. R. EVID. 704 cmt.

[41] Relatedly, Defendant complains that Anderson did not consider whether the procedures were inpatient or outpatient procedures. It argues that Defendant is reimbursed differently by BCBSLA based on this distinction. As discussed above, however, Plaintiff need not tie its damages calculation to the amount received by Defendant from BCBSLA.

[42] Doc. 42-1 at 15.

This Court has already rejected similar arguments raised by Defendant.[43] This Court does not agree that Plaintiff's Complaint limits its theory of damages to in-network payments. Breach of contract damages "are measured by the loss sustained by the obligee and the profit of which he has been deprived."[44] Plaintiff is entitled to present expert testimony calculating the amount of lost profits it believes it is owed. To the extent that Defendant disagrees with the underlying data Anderson used in his calculations, "[q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."[45] Defendant's Motion is denied.

### D. Motion for Leave to File Supplemental Witness List

Finally, Defendant moves to supplement its witness list. The deadline to file witness lists in this matter was May 5, 2023. On August 14, 2023, Defendant moved for leave to supplement its witness list to add a new fact witness, Brandon Landry. Defendant contends that Landry is the CEO of Neuro Diagnostic Monitoring, LLC, a company that Defendant hired in July 2023 to perform IONM services at its facility. It argues that good cause exists to allow the late addition of Landry as a witness because it did not discover him until he was hired in July 2023. Defendant contends that Landry will testify as to "his knowledge of the current IONM practices at Defendant's hospital, his negotiations specifically with Defendant for IONM services, and his negotiations with nearly 15 other Louisiana health care facilities for those same services."[46]

---

[43] Doc. 78.
[44] LA. CIV. CODE art. 1995.
[45] United States v. Hodge, 933 F.3d 468, 478 (5th Cir. 2019), *as revised* (Aug. 9, 2019).
[46] Doc. 81-1.

Clearly missing from the description of Landry's anticipated testimony, however, is any fact in his personal knowledge that is relevant to the Assure– Avala Agreement or the issues in this case. Landry does not appear to have been involved in any way in the Assure–Avala Agreement. Rather, it appears that Defendant intends to elicit an expert opinion from Landry regarding the customs and practices in the industry.[47] Defendant's request to add Landry as a witness comes just one week after this Court denied some of its arguments to limit the testimony of Plaintiff's expert.[48] Accordingly, it seems clear to this Court that Defendant hopes to introduce Landry's testimony to rebut the opinions of Plaintiff's expert. Defendant's deadline to disclose expert opinions in this matter was April 14, 2023. Defendant has not shown good cause for its failure to timely identify an expert to rebut the opinions of Plaintiff's expert. Defendant's request to supplement its witness list is denied.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings is **GRANTED**, and all other Motions are **DENIED**.

New Orleans, Louisiana this 7th day of September, 2023.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[47] *See* E.Z. Aces Gaming Inc. v. Penn-Am. Ins. Co., No. 2:21-CV-01250, 2022 WL 17254889, at *4 (W.D. La. Nov. 28, 2022) ("[Witness Riley's] letter shows that he lacks personal knowledge of the events underlying the suit, which is required as a fact witness under Federal Rule of Evidence 602. Because of this, any evidence Mr. Riley could present at trial would be expert testimony and fall under Federal Rule of Evidence 702.").

[48] Docs. 78, 81.